J-S29004-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.N.S. A/K/A J.S., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.L.J. A/K/S M.S., MOTHER | : : : : : | |
| | : | No. 80 EDA 2018 |

Appeal from the Decree November 29, 2017
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-AP-0000072-2017
CP-51-DP-0001716-2015

BEFORE:   PANELLA, J., MURRAY, J., and STEVENS*, P.J.E.

MEMORANDUM BY PANELLA, J.                    **FILED AUGUST 24, 2018**

Appellant, M.S. ("Mother"), appeals from the decree and order entered November 29, 2017, involuntarily terminating her parental rights to J.S. (born in July 2008) ("Child") pursuant to § 2511 (a)(1), (2), (5), (8), and (b) of the Adoption Act and changing Child's permanency goal to adoption under § 6351 of the Juvenile Act. We affirm.

The trial court has set forth the factual background and procedural history of this case in its opinion. **See** Trial Court Opinion, 2/15/18, at 2-14. We adopt the trial court's recitation for purposes of this appeal, and we set forth herein only those facts, as found by the trial court, that are necessary to understand our disposition of the appeal.

_____
* Former Justice specially assigned to the Superior Court.

On June 8, 2015, the Department of Human Services ("DHS") received a General Protective Services ("GPS") report, stating that Mother was mentally unstable and abusing drugs and alcohol. The report also alleged that Mother had an informal custody agreement with a family friend, K.B., wherein K.B. would care for Child during the week while Mother attended drug and alcohol treatment, and Mother would care for Child on weekends. The report further alleged that Mother violated the informal custody agreement by not returning Child to K.B. because she believed K.B. physically abused Child.

On June 9, 2015, DHS went to Maternal Grandfather's house to investigate the GPS report. DHS spoke with Child about the allegations that K.B. abused her. Child admitted she lied, stating that K.B. did not abuse her, but disciplined her by hitting her three times on the back of her hand with a ruler for forging K.B.'s name on a school document.

DHS then viewed a notarized document signed by Mother on July 31, 2014, awarding temporary custody of Child to K.B., so that K.B. could enroll Child in school in Landsdowne, Pennsylvania. DHS learned that Child has been residing with K.B. since about May 2014.

DHS further learned that Mother attended substance abuse treatment for approximately one week, but never completed the program. DHS noted that Mother had also undergone two brain surgeries for traumatic brain injuries caused by domestic violence with a paramour. DHS ultimately found

K.B. to be an appropriate caregiver for Child and K.B.'s home to be suitable for Child. On the same day, DHS implemented a Safety Plan, in which Mother agreed to allow Child to remain in the home of K.B.

On June 22, 2015, K.B. informed DHS that she did not feel she could continue to care for Child and she wanted Child removed from her home because Child pushed K.B.'s ten-month-old niece off the couch, head first. On June 24, 2015, DHS obtained an Order of Protective Custody ("OPC") and placed Child in foster care through the Community Umbrella Agency ("CUA") Asociación de Puertorriqueños en March. At the shelter care hearing for Child on June 26, 2015, the trial court lifted the OPC, temporarily committed Child to DHS, and referred Mother to the Clinical Evaluation Unit ("CEU") for a forthwith drug screen, dual diagnosis assessment, and monitoring. On July 23, 2015, the trial court received a CEU Report, stating Mother did not comply with the court order for a drug and alcohol assessment.

At the adjudicatory hearing on July 24, 2015, the court adjudicated Child dependent and fully committed Child to DHS. The court ordered legal custody to remain with DHS and placement to continue in foster care. The court further ordered Mother to attend supervised weekly visits at the agency and to complete an assessment, monitoring and three random drug screens at CEU.

On October 12, 2015, DHS and CUA held a Single Case Plan ("SCP") meeting. Mother's SCP objectives were: (1) to arrive at the agency at the

scheduled date and times for visits with Child; (2) to make herself available to attend all meetings as needed; (3) to go to CEU as requested to give three random drug screens and attend all required appointments; (4) to attend Achieving Reunification Center ("ARC") classes and comply with all tasks; and (5) to attend all of her appointments at WEDGE in compliance with her treatment plan.

Several permanency hearings were held between 2016 through 2017. On November 9, 2017, DHS filed a petition to involuntarily terminate Mother's parental rights to Child, and to change Child's permanency goal to adoption. The trial court held a hearing on the petition on November 29, 2017. At the hearing, Child was represented by both a guardian *ad litem* and a special child advocate. DHS presented the testimony of Mr. Kyrie McChristian, CUA case manager. Mother, represented by counsel, did not testify on her own behalf. On the same day, the trial court entered its decree and order involuntarily terminating Mother's parental rights to Child, and changing Child's permanency goal to adoption.

On December 27, 2017, Mother timely filed a notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). Mother raises the following issues for our review.

    1. Did the trial court commit reversible error, when it involuntarily terminated Mother's parental rights where such determination was not supported by clear and convincing

evidence under the Adoption Act, 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8)?

2. Did the trial court commit reversible error, when it involuntarily terminated Mother's parental rights without giving primary consideration to the effect that the termination would have on the developmental, physical and emotional needs of Child as required by the Adoption Act, 23 Pa.C.S. § 2511(b)?

3. Did the trial court commit reversible error, when it terminated Mother's parental rights and changed Child's goal to adoption as substantial, sufficient, and credible evidence was presented at the time of trial, which would have substantiated denying the petition for goal change?

Mother's Brief, at 4.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by § 2511 of the Adoption Act, which requires a bifurcated analysis.

- 5 -

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any *one* subsection of § 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We need only address subsection (a)(2).

Section 2511(a)(2) provides, in relevant part, as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

Our Supreme Court set forth our inquiry under subsection (a)(2) as follows.

> [Section] 2511(a)(2) provides statutory grounds for termination of parental rights where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." . . .
>
> This Court has addressed incapacity sufficient for termination under § 2511(a)(2):
>
>> A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

*In re Adoption of S.P.*, 47 A.3d 817, 827 (Pa. 2012) (citations omitted).

"The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa. Super. 2015) (citation omitted).

With respect to subsection (a)(2), the trial court found that Mother failed to address the conditions which brought Child into placement. *See* Trial Court Opinion, 2/15/18, at 21. The trial court relied on the credible testimony of Mr. McChristian. *See id*. The trial court noted that Mother was

referred and re-referred to various drug and alcohol treatment programs throughout the history of this case; however, she did not successfully complete the programs. *See id*., at 23. The trial court further found that Mother was also inconsistent with visitation, which led to a suspension of her visits with Child. *See id*. Additionally Mother did not comply with CEU for drug testing. The trial court determined that Mother failed to perform her parental duties in order to reunite with Child. *See id*. The trial court opined that Mother will not be able to fulfill her parental responsibilities to Child in the future. *See id*. Thus, the trial court concluded that DHS presented clear and convincing evidence to terminate Mother's rights pursuant to subsection (a)(2).

Mother, however, argues that the trial court erred in terminating her parental rights under this subsection. Mother contends that she has cooperated with DHS/CUA, and has substantially complied with her SCP goals so that she could parent and reunite with Child. Mother maintains that she has successfully completed housing, financial, and parenting classes through ARC, and she has completed an inpatient drug and alcohol rehabilitation program at Valley Forge Medical Center. Mother points out that, at the time of the termination hearing, she was enrolled in a treatment program through WEDGE. Mother claims that if she was given some additional time, she would have completed her SCP goals to reunite with

Child. Mother, thus, contends that termination of her parental rights under subsection (a)(2) is against the weight of the evidence.

After a thorough review of the record in this matter, we conclude that the trial court did not abuse its discretion by involuntarily terminating Mother's parental rights to Child. During the termination hearing, Mr. McChristian testified that he has been the CUA case manager since July 27, 2017, and has reviewed the full history of the case. *See* N.T., 11/29/17, at 8. Mr. McChristian stated that, prior to Child entering foster care, Mother signed an informal custody agreement, entrusting Child into someone else's care due to her issues with drugs and alcohol. *See id*., at 8-9. Mr. McChristian testified that Child has been in foster care since July 2015. *See id*., at 11. Mr. McChristian testified that, at the time that he inherited the case, Mother's SCP objectives were: (1) to avail herself to CUA; (2) to address drug and alcohol concerns by attending treatment program; (3) and to undergo CEU screenings and assessments. *See id*., at 10. Mr. McChristian informed the court that Mother has not been in compliance with her current SCP objectives. *See id*., at 15.

Mr. McChristian testified that, when the case was transferred to him, he did not have Mother's contact information and had to reach out to her inpatient counselor, who was able to help him connect with Mother about her SCP goals. *See id*., at 14. Mr. McChristian further testified that Mother was

given his contact information about two months ago; however, Mother has not tried to get in contact with him since then. ***See id***., at 15.

Mr. McChristian stated that Mother has not successfully completed any sort of drug and alcohol treatment while Child has been in foster care. ***See id***. Mr. McChristian testified that Mother is currently at an inpatient drug and alcohol treatment program at Valley Forge Medical Center. ***See id***., at 12. Mr. McChristian stated that Mother has not provided any documentation to him regarding the program. ***See id***. Mr. McChristian testified that Mother failed to inform him that she was discharged from inpatient treatment in October 2017 and that she was enrolled in another drug treatment program. ***See id***., at 28.

Mr. McChristian acknowledged that Mother attended ARC and completed programs for housing, parenting, and financial counseling in 2016, prior to him receiving the case. ***See id***., at 35. Mr. McChristian, however, stated that Mother has not demonstrated that she has appropriate and safe housing to reunify with Child. ***See id***., at 37. Regarding visitation, Mr. McChristian testified that the court ordered that Mother's visitations would be suspended if she missed three visits with Child in May 2016. ***See id***., at 12-13. Mother subsequently missed three visits and her visits were officially suspended by the court. ***See id***., at 13. Mr. McChristian testified that he cannot recall the last time Mother saw Child. ***See id***., at 12.

DHS presented a CEU Report dated November 28, 2017, which showed Mother failed to attend both assessments scheduled on August 30, 2017, and rescheduled on September 26, 2017. *See id*., at 15. It further showed that Mother had a drug screen on August 9, 2017, the date of the last court listing, in which she tested positive for alcohol. *See id*.

Mother did not testify. Mother submitted a report that she was admitted to Valley Forge Medical Center on September 14, 2017 and was discharged in October 2017. *See id*., at 37. Mother further presented a document showing she has been enrolled at WEDGE medical center since October of 2017. *See id*.

At the conclusion of the termination hearing, the trial court determined that Child has been in foster care for twenty-eight months and Mother has not become "one iota closer" to being a parent to Child than at the time Child was brought into care. *Id*., at 51. The trial court noted that, prior to Child being placed into foster care, Mother agreed to place Child into the physical custody of a third party. *See id*., at 50-51. The trial court found that Mother has failed to put herself in a position to parent Child, has not parented Child for at least two years, and remains on the outskirts of the Child's life. *See id*., at 51. The trial court noted that Mother's visits with Child were inconsistent as there were more missed visits than there were actual visits, which led to the suspension of her visits. *See id*. The trial court opined that, although Mother has taken some steps to enter a drug and

alcohol program here and there, and some belated attempts to enter some mental health programs throughout the life of this case, whatever Mother has done has been unsuccessful, as it has not led to any enhanced ability to parent Child. *See id*., at 49. The trial court reasoned that throughout the history of the case, Mother enters a drug and alcohol program, partially completes a program, and/or drops out of others. *See id*. The trial court opined that Mother's unresolved issues with drugs and alcohol are further evidenced by positive drug screens. *See id*. The trial court concluded, that based on the evidence, there was sufficient evidence pursuant to subsection (a)(2) that Mother has failed to remedy the issues which brought Child into foster care. *See id*., at 51.

We conclude that Mother's arguments regarding subsection (a)(2) essentially seek for this Court to make credibility and weight determinations different from those of the trial court. The record clearly reveals that Mother did not make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. The record demonstrates that Child has been in foster placement since approximately June 2015, at which time Child was one month shy of seven years old. By the time of the termination hearing, Child had been in foster placement approximately two years and five months. Child is now nine years old. The testimony presented at the termination hearing establishes that Mother was aware of her SCP goals, but failed to comply despite an ample amount of time given to do so.

Accordingly, Mother did not engage in reasonable efforts to reunify with Child.

"[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." **In re Adoption of R.J.S.**, 901 A.2d 502, 513 (Pa. Super. 2006). Hence, the record substantiates the conclusion that Mother's repeated and continued incapacity, neglect, or refusal has caused Child to be without essential parental control or subsistence necessary for her physical and mental well-being. Moreover, Mother cannot or will not remedy this situation. Thus, the trial court did not abuse its discretion in terminating Mother's parental rights under subsection (a)(2).

Next, we address § 2511(b).

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

- 13 -

The focus in terminating parental rights under subsection (a) is on the parent, but it is on the child pursuant to subsection (b). *See In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super 2008) (*en banc*). In reviewing the evidence in support of termination under section 2511(b), our Supreme Court has stated as follows.

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security, and stability. … [T]he determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (some internal citations and quotation marks omitted; brackets added and deleted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." *In re Z.P.,* 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted).

Here, the trial court concluded that DHS presented clear and convincing evidence that termination of Mother's parental rights was in the best interest of Child. *See* Trial Court Opinion, 2/15/18, at 24. The trial court found that Mother failed to parent Child even before Child was placed into foster care by DHS, as she allowed others to care for Child, and would

abandon Child for periods of time. *See id*., at 25. The trial court opined that Child's relationship with Mother has not progressed, as Mother has not served as a parental figure since her removal. *See id*. The trial court heard reliable bonding testimony from Mr. McChristian, who opined that Child was not bonded to Mother, and referred to Foster Mother as "Mom." *Id*. The trial court noted that Foster Mother provides Child with safety, comfort and meets all of her daily needs. *See id*.The trial court concluded that Child would not suffer irreparable harm if Mother's rights were terminated as termination meets the developmental, physical and emotional needs and welfare of Child. *See id*.

Mother, however, contends that DHS did not satisfy the requirements of subsection (b) by proving beyond clear and convincing evidence that termination of Mother's parental rights is in the best interest of Child. Mother argues that Mr. McChristian testified that Child stated she misses Mother and wishes to see her. Mother claims that she and Child share a beneficial bond that should not be destroyed though termination of her parental rights. Mother asserts that there was no testimony or evidence presented to show that Child would not suffer irreparable harm if the bond Child shares with Mother was severed. Mother argues that DHS failed to establish that Child would not suffer irreparable harm if Mother's parental rights were terminated.

Mr. McChristian stated that Child initially told him that she misses Mother and wants to see her. *See* N.T., 11/29/17, at 16. Mr. McChristian informed the court that Child has not seen Mother for about a year. *See id*., at 25. Mr. McChristian stated that lately Child has not mentioned Mother, and when Mother cancelled her visits with Child, Child was not upset and displayed no behavior issues. *See id*., at 24. Mr. McChristian opined that Child would not suffer irreparable harm if Mother's parental rights were terminated. *See id*.

Mr. McChristian testified that Child has been with Foster Mother at her current foster placement since April 2017, which is a pre-adoptive home. *See id*., at 21-22. Mr. McChristian stated that he observed the interactions between Child and Foster Mother. *See id*., at 21. Mr. McChristian testified that Child calls Foster Mother, "Mom." *Id*. Mr. McChristian stated that Child runs up to Foster Mother and sits on her lap when they talk. *See id*., at 22. Mr. McChristian testified that Foster Mother meets Child's needs and Child turns to Foster Mother to have her needs met. *See id*.

Mr. McChristian also testified that Child has a loving relationship with Foster Mother. *See id*., at 29. Mr. McChristian stated that Child is definitely bonded with Foster Mother. *See id*., at 22. Mr. McChristian stated that he spoke to Child about the process of being adopted by Foster Mother. *See id*., at 30. Mr. McChristian informed the court that Child would like to stay with Foster Mother. *See id*. Mr. McChristian testified that it is in Child's best

interest to be adopted by Foster Mother where she has stability and her educational, developmental and medical needs are being met. *See id*., at 23.

Mother did not testify at the hearing. At the conclusion of termination hearing, the trial court noted that Child has found a family that is willing to provide all the love and care that Mother has decided not to provide. *See id*., at 51. The trial court found that Child's life cannot be put on hold until Mother remedies her drug and alcohol issues and Mother decides to be a parent. *See id*., at 52. The trial court determined that it is unlikely that Mother will decide to step up and place herself in a position to parent Child in the near future. *See id*., at 51. The trial court opined that Child's future is with her new pre-adoptive family. *See id*., at 53. The trial court concluded that it is in the best interest of Child to be adopted by Foster Mother pursuant to subsection (b). *See id*., at 51-52.

Based on the foregoing testimonial evidence and the totality of the record evidence, we discern no abuse of discretion or legal error by the trial court in concluding that termination of Mother's parental rights would best serve Child's needs and welfare. The trial court thoroughly considered Child's bond with Mother, and the effect of severing that bond. The trial court properly relied on Mr. McChristian's testimony, and determined that there is no bond or substantial relationship between Child and Mother that, if severed, would cause a detrimental effect on Child. The evidence also

establishes that Child receives consistency and permanency by having her emotional and developmental needs met by Foster Mother. As such, the trial court correctly prioritized Child's emotional well-being and need for safety, permanency and stability over Mother's wishes.

While Mother may profess to love Child, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. **See In re Z.P.**, 994 A.2d at 1121. A child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." **In re Z.S.W.**, 946 A.2d at 726, 732 (Pa. Super 2008) (citations omitted). Rather, "a parent's basic constitutional right to the custody and rearing of his … child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." **In re Z.P.**, 994 A.2d at at 1120 (citation omitted).

Thus, the failure to terminate Mother's parental rights would condemn Child to a life in foster care with no possibility of obtaining a permanent and stable home. As there is competent evidence in the record that supports the trial court's findings and credibility determinations, we find no abuse of the trial court's discretion in terminating Mother's parental rights to Child under subsection (b).

Next, we consider Mother's third issue, in which she contends that the trial court erred in changing Child's permanency goal from reunification to

adoption as it is not in the best interest of Child when she and Child share a beneficial bond that should not be destroyed. Mother points out that Mr. McChristian testified that she stated she misses Mother and wishes to see her.

Our standard of review in a dependency case is as follows:

[T]he standard of review in dependency cases requires an appellate court to accept findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. We review for abuse of discretion….

*In re L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015) (internal citation and quotation marks omitted).

Regarding the disposition of a dependent child, § 6351(e), (f), (f.1), and (g) of the Juvenile Act provide the trial court with the criteria for its permanency plan for the subject child. Pursuant to those subsections, the trial court is to determine the disposition that is best suited to the safety, protection and physical, mental and moral welfare of the child.

When considering a petition for goal change for a dependent child, the trial court considers:

the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved.

*In re A.K.*, 936 A.2d 528, 533 (Pa. Super. 2007) (citing 42 Pa.C.S.A. § 6351(f)).

Additionally, the law requires the trial court to make a determination regarding the child's placement goal:

**(f.1)   Additional   determination.—**Based   upon   the determinations   made   under   subsection   (f)   and   all   relevant evidence presented at the hearing, the court shall determine one of the following:

* * *

(2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights   in   cases   where   return   to   the   child's   parent, guardian or custodian is not best suited to the safety, protection   and   physical,   mental   and   moral   welfare   of   the child.

* * *

42 Pa.C.S.A. § 6351(f.1).

On the issue of a placement goal change, this Court has stated:

When   a   child   is   adjudicated   dependent,   the   child's   proper placement turns on what is in the child's best interest, not on what the parent wants or which goals the parent has achieved. Moreover,   although   preserving   the   unity   of   the   family   is   a purpose of [the Juvenile Act], another purpose is to "provide for the care, protection, safety, and wholesome mental and physical development   of   children   coming   within   the   provisions   of   this chapter." 42 Pa.C.S. § 6301(b)(1.1). Indeed, the relationship of parent and child is a status and not a property right, and one in which the state has an interest to protect the best interest of the child.

*In re K.C.*, 903 A.2d 12, 14-15 (Pa. Super. 2006) (some internal citations, brackets, and quotation marks omitted).

With regard to the goal change, the trial court found that competent and persuasive evidence was presented by DHS that reasonable efforts were made to give Mother the opportunity and means for reunification with Child. **See** Trial Court Opinion, 2/15/18, at 26. The trial court determined that Mother failed to use the referrals and resources provided by DHS. **See id**. The trial court specifically found that Mother failed to appear at CEU for drug testing, and failed to appear for supervised visits with Child, which led to her visitations being suspended. **See id**. The trial court opined that the record clearly and convincingly demonstrates that reunification was not feasible and that adoption was inevitable. **See id**., at 27. The trial court, thus, concluded that there was sufficient competent evidence in the record to change the permanency goal from reunification to adoption. **See id**.

After our careful review of the record, we have determined that the findings of fact and credibility determinations of the trial court are supported by competent evidence in the record. We, therefore, affirm the trial court's decree terminating Mother's parental rights to Child, and its order changing the Child's permanency goal to adoption.

Decree and order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/24/18